IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEOFFREY PETE,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY OF OAKLAND, a Municipal Corporation, KYLE THOMAS, MIKE MORSE, DAVID KOZICKI, and PEDRO ESPINOZA, individually and in their capacity as Police Officers/Administrators of the Oakland Police Department, DOWNTOWN REALTY COMPANY, INC., and DOES 3–100,<br><br>    Defendants. | No. C 09-06097 WHA<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this civil-rights action, all remaining defendants move for summary judgment on all claims against them. Plaintiff opposes. For the reasons explained below, the defense summary judgment motions are **GRANTED**.

**STATEMENT**

Plaintiff Geoffrey Pete is an African-American businessman. He represents — and defendants do not deny — that he is "highly visible in civic and community activism" in Oakland and has served that community as an "entertainment impresario" (Opp. 1, 22). Until February 2009, Pete operated a nightclub in downtown Oakland. This action arises from the events leading to Pete's decision to close his club, and also from later developments related to Pete's attempt to host a party at a different venue.

Pete owns a facility in downtown Oakland, near the intersection of Fourteenth Street and Broadway. Pete has a cabaret license for this facility, and in 1993 he began operating a nightclub there. He temporarily shut the nightclub down in 2000 but reopened it in 2003 (Vose Exh. A(1) at 20–21). The club — called Geoffrey's Inner Circle — regularly hosted large events on the first Saturday of each month, known as "First Saturdays." GIC also hosted after-parties for concerts and receptions for various celebrities, such as the rap mogul Jay-Z (*id.* at 217). These events generally were held between 9:00 p.m. and 2:00 a.m., and they drew crowds of up to 500 patrons (*id.* at 29, 46–47). Pete hired security personnel to staff events at GIC when he felt such services would be needed (*id.* at 44–46). On nights of large events, including First Saturdays, Pete also rented a nearby parking garage for his patrons to use.

Pete's opposition briefs describe three general fact patterns underlying his legal claims for relief. The first narrative relates to the parking garage. Defendant Kyle Thomas, an Oakland police sergeant, visited the garage in December 2008. He spoke with the garage supervisor, Amer Kaddoura, and informed him that illegal activities had taken place in the garage while it was rented to Pete for his First Saturdays events. The precise content of Sergeant Thomas's statements to Kaddoura is disputed, but it is agreed that Thomas referenced a shooting or shootings, and Kaddoura recalls that Thomas mentioned drug dealing as well (Metcalf Exh. E-9 at 24). The parties also disagree as to whether Sergeant Thomas's statements to Kaddoura were truthful. This order assumes the most favorable inferences to the party resisting summary judgment. After the visit from Sergeant Thomas, Kaddoura spoke with his supervisor at the garage, Gloria Verduzco (Vose Exh. A(6) at 31). She then decided to contact Pete and tell him that he could not rent the garage for future events (Vose Exh. A(8) at 34). Because Pete's patrons no longer could park in the garage, Pete concluded that "it no longer, in my view, was a smart thing to do to continue" the nightclub business (Vose Exh. A(1) at 215:17–19). In February 2009, Pete officially closed his club. At his deposition, Pete testified: "The closing of the parking lot was what caused me to shut down as a night club." (*id.* at 103:17–18). Pete now leases his facility to a church for $17,250 a month (*id.* at 199–200).

The second fact pattern underlying this action relates to the Oakland Police Department's alleged efforts to force Pete to pay excessively for police services at GIC. Pete claims that OPD applied Oakland Municipal Code Chapter 9.52 — which allows OPD to charge for deployment of "extraordinary police services for special events" — "in a baseless and arbitrary manner that forced club owners to pay for ordinary, routine police services" (Opp. 1). Relatedly, he claims that OPD "began arbitrarily assigning large number of police to his business and attempting to have Plaintiff pay overtime for the unnecessary police services deployed to his location" [*sic*] (*id.* at 2). Pete's opposition briefs recount the recent history of OPD's alleged budget and legislative concerns, leading to the allegation that "OPD employed Code Chapter 9.52 to justify charging Plaintiff thousands of dollars without any justification whatsoever, except its unbridled authority to make whomever they chose, pay whatever sums of money they chose" (*id.* at 1). The summary judgment record, however, contains no evidence that Pete or GIC ever paid or was billed for police services. Defendants admit that at least Sergeant Kyle Thomas "came to believe that GIC should be required to pay for the extraordinary police services required to police the 1st Saturday events" (Dkt. No. 100 at 6). To justify his position, defendants cite evidence that when crowds emptied into the streets after events at GIC, chaotic conditions and dangerous, illegal activity often ensued (*id.* at 4–6).

The third factual narrative underlying this action relates to Pete's attempt to host a large-scale birthday party for himself after he closed GIC. The party was to take place on March 7, 2009, at Sweet's Ballroom — another venue in downtown Oakland. Pete began preparations for this party "several weeks" in advance, for example by sending an "e-blast" of about six thousand invitations (Vose Exh. A(1) at 104–05). Some time before the party, OPD notified the venue that eighteen officers would be required to provide security for the event, at a cost of $7,626 (Metcalf Exh. B-9). Upon learning of this charge, Pete called Jeff Baker, the Assistant to the City Administrator, with whom he already had a "professional" relationship. Pete recalls that Baker's intervention halved the number of required officers and that Baker directed him to apply for a special permit for the event (Vose Exh. A(1) at 107–11). The day before the party, Pete went to the OPD station on 73rd Avenue, without an appointment, to apply for the

3

special permit. Pete waited "about 15 minutes" to be helped, and then "about 20 minutes" more while Officer Mike Morse took action on his request. When Officer Morse returned, he informed Pete that the permit could not be issued because there was not enough time to arrange for appropriate police coverage (*id.* at 170–74; Morse Decl. ¶ 5). Pete again called Baker, who later told him the party could take place after all. On the evening of the party, however, Officer Morse arrived at Sweet's Ballroom several hours before the planned start time and did not allow the event to go forward (Vose Exh. A(1) at 176–80).

On the strength of these three factual narratives, Pete alleges that the City of Oakland and OPD officers have deprived him of his civil rights. Pete argues that it was this "ongoing harassment and oppression that eventually forced him to close his doors" as operator of the GIC night club (Opp. 1). The defendants remaining in this action include four individual OPD officers — Kyle Thomas, Mike Morse, David Kozicki, and Pedro Espinoza — and the City of Oakland. The operative complaint alleges that all defendants deprived Pete of his civil rights in violation of 42 U.S.C. 1983, and that the individual defendants did so by way of "threats, intimidation, or coercion" in violation of California Civil Code Section 52.1 (Dkt. No. 37). All defendants move for summary judgment on all claims against them; defendant Kozicki filed his own motion, and the other defendants filed a joint motion. This order follows full briefing and a hearing on both motions.[1]

**ANALYSIS**

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the

---

[1] Pete's brief opposing defendant David Kozicki's motion (Dkt. No. 121) is nearly identical to his brief opposing the other defendants' motion (Dkt. No. 120). The two opposition briefs have somewhat different pagination, but their content differs only as to Pete's third claim for relief pursuant to Section 52.1 of the California Civil Code. For convenience, all citations to "Opp." refer to the pagination in Pete's opposition to the joint summary judgment motion (Dkt. No. 120). Docket numbers are used instead when differentiating between the two briefs is necessary.

4

non-moving party, and "material" only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In this analysis, all reasonable inferences must be drawn in the light most favorable to the non-moving party. *Johnson v. Racnho Santiago Cmty. Coll. Dist.*, 623 F.3d 1011, 1018 (9th Cir. 2010). Unsupported conjecture or conclusory statements, however, cannot defeat summary judgment. *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).

Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claims, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party does not satisfy its initial burden, then the non-moving party has no obligation to produce anything and summary judgment must be denied. If, however, the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show there exists a genuine issue of material fact. *Id.* at 1102–03.

In this case it is worth emphasizing that a party resisting summary judgment *must produce admissible evidence in order to survive the motion — it is not enough to harken back to the pleadings*. FRCP 56(c); *Gerlinger v. Amazon.com*, 526 F.3d 1253, 1256 (9th Cir. 2008).

### 1. EVIDENCE

Multiple requests for judicial notice have been filed relating to the instant motions. "A court shall take judicial notice if requested by a party and supplied with the necessary information." FRE 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FRE 201(b).

All parties request judicial notice of Oakland Municipal Code Section 9.52, which governs special event permits (Dkt. Nos. 101, 105, 126). Because it relates to a matter of public record, this request is **GRANTED**. Plaintiff Geoffrey Pete also requests judicial notice of three

1  other items: (1) newspaper article from the Eastbay Express called "The Club Crackdown," dated
2  August 11, 1999; (2) a memorandum from the Oakland Chief of Police to "All Personnel," dated
3  April 9, 2009; and (3) a copy of an Oakland Police Department manual of rules (Dkt. No. 126). A
4  court "may take judicial notice of adjudicative facts appearing in newspapers." *Crowder v.*
5  *Kitagawa*, 81 F.3d 1480, 1492 n.10 (9th Cir. 1996). As to the newspaper article, Pete's request
6  for judicial notice is **GRANTED**. As to the memorandum and police manual, however, Pete's
7  request for judicial notice is **DENIED**. The facts contained in these documents are not generally
8  known. Pete does not indicate that they are matters of public record, nor does Pete indicate that
9  they have been authenticated through a sworn declaration or deposition testimony. Accordingly,
10 the memorandum and manual are not proper items for judicial notice.

11         Defendants also have filed many evidentiary objections to Pete's submissions opposing
12 the instant motion. Because this order does not rely on any statements in Pete's declaration, all
13 objections thereto are **MOOT** (Dkt. Nos. 141, 138 at 12–15). Because this order does not rely on
14 exhibits 1 or 2 to the Pete declaration, all objections there to are also **MOOT** (Dkt. No. 138 at 15).
15 Defendants object to Dkt. Nos. 124–137 as untimely (*id.* at 12). Pete's opposition to the summary
16 judgment motions was due on February 17. Attorney Amanda Metcalf began filing Pete's
17 opposition briefs and supporting documents around 9:00 p.m. on February 17 and finished this
18 task at 3:09 a.m. the following morning. Defendants do not claim that they were prejudiced by
19 this three-hour delay in Attorney Metcalf's filing of the last group of materials. As to the
20 documents filed at Dkt. Nos. 124–137 that are cited in this order, defendants' timeliness
21 objections are **OVERRULED**. As to all other documents filed at Dkt. Nos. 124–137, defendants'
22 timeliness objection are **MOOT**. Defendants also object to all exhibits attached to Attorney
23 Metcalf's declaration as not properly authenticated (*ibid.*). Attorney Metcalf's declaration,
24 however, states that it is based on her "own personal knowledge" and that the attached documents
25 "are true and correct copies" of the items she identifies them as being (Metcalf Decl. ¶¶ 1–2).
26 Defendants do not attack the veracity of these statements or otherwise explain the basis for their
27 position that these exhibits are not properly authenticated. As to the Metcalf exhibits cited in this
28

6

order, defendants' authentication objections are **OVERRULED**. As to all other Metcalf exhibits, defendants' authentication objections are **MOOT**.

### 2. SECTION 1983

"Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. 1983. To prevail in a civil action against state actors for deprivation of such rights, privileges, or immunities, a plaintiff must show that (1) acts by defendants (2) under color of law (3) deprived him of federal rights, privileges, or immunities, and (4) caused him damage. *Thornton v. City of Saint Helens*, 425 F.3d 1158, 1163–64, (9th Cir. 2005).

Pete's first two claims for relief allege that all defendants violated Section 1983 by depriving him of (1) the right to free association and assembly, (2) the right to equal protection of the law, (3) the right not to be deprived of liberty or property without due process of law, and (4) the right to be free from harassment and/or intimidation based on race (Dkt. No. 37 at 14–16). Pete does not cite any authority for the proposition that "the right to be free from harassment and/or intimidation based on race" is a right secured by the Constitution or federal laws. Accordingly, violation of this alleged right cannot form the basis for his Section 1983 claims. Pete's other three asserted Constitutional rights will be addressed in turn.

#### A. Free Association and Assembly

Pete's asserted right to free association and assembly derives from the First Amendment (Opp. 22). Pete relies on a line of Supreme Court decisions establishing that the First Amendment protects not only "intimate human relationships," but also "a right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion." *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989). In this very line of decisions, however, the Supreme Court has specifically held that the Constitution does not recognize "a generalized right of 'social association' that includes chance encounters in dance halls." *Id.* at 25. Defendants' legal

7

1  argument that "the First Amendment does not confer a constitutional right of association to either
2  a club owner or his or her patrons to party at a nightclub" shifts to Pete the burden of producing
3  evidence that he has been deprived of a cognizable First Amendment right (Dkt. No. 138 at 6).
4  Pete has not carried this burden.

*First*, Pete argues that because First Amendment protection extends to "live entertainment, such as musical and dramatic works" GIC's function as a venue for live entertainment is protected (Opp. 22). Not so. Admittedly a "nightclub," GIC hosted precisely the type of dance-hall assembly that the *Stanglin* decision exempted from First Amendment protection. Pete's attempt to shoe-horn GIC events into another category of expressive activity is unavailing.

Second, Pete points to other uses of his facility besides the GIC nightclub events. Pete claims that he "has also held political and community forums at his business," that the venue has "served as a free holiday dining hall for the homeless and underprivileged," and that he has "produced stand-up comedy showcases" (*id.* at 22–23). Without deciding whether these other functions are protected by the First Amendment, this order finds that Pete offers no evidence that the use of his facility for such purposes has been restricted. Pete no longer operates the GIC night club at his downtown Oakland facility. There is no indication that any other use of that venue (expressive or otherwise) has been curbed. Indeed, Pete testified that he now rents the facility to a church (Vose Exh. A(1) at 200).

Pete makes no other argument as to how his right to free association and assembly allegedly has been violated. In particular, Pete does not argue that the cancellation of his March 2009 party at Sweet's Ballroom violated this right. Pete has not met his burden of producing evidence that would enable a reasonable juror to find that his right to free association and assembly was infringed. This theory does not survive defendants' summary judgment motion.

### B. Equal Protection

The equal protection clause of the Fourteenth Amendment makes it unlawful for states to "deny to any person within its jurisdiction the equal protection of the laws." Pete claims defendants violated his right to equal protection of the laws by selectively enforcing laws and

8

regulations against him on the basis of race (Opp. 19–22). The standard for proving a selective-enforcement claim "is a demanding one." *United States v. Armstrong*, 517 U.S. 456, 463–64 (1996). To succeed on this claim, Pete must show "both that [his treatment] had a discriminatory *effect* and that it was motivated by a discriminatory *purpose*." *Wayte v. United States*, 470 U.S. 598, 608–09 (1985) (emphasis added). Defendants argue that Pete is unable to prove either element of his selective-enforcement theory.

Regarding the second element, discriminatory purpose, defendants argue there is no evidence that the actions Pete complains of were motivated by racial animus. In response, Pete is unable to identify any admissible evidence of discriminatory intent. Most of the documents and testimony Pete cites as evidence of discriminatory purpose do not mention or allude to race at all (Metcalf Exh. A-23; Metcalf Exh. A-5; Metcalf Exh. A-17; Metcalf Exh. E-3 at 343:5–15; Pete Decl. ¶¶ 3–4). There are only two exceptions. Neither supports the proposition that defendants' dealings with Pete, GIC, or the parking garage were motivated by racism.

*First*, Pete makes the claim that "the OPD only targeted entertainment businesses owned by African-Americans because they believed that no Caucasian clubs in Oakland had problems with criminal or unruly behavior" (Opp. 21). Without weighing the probative value of such evidence, this order finds that it is not even supported by the record; it is based on deposition testimony showing only that defendant David Kozicki was not aware of any "predominantly white" clubs existing in Oakland at all (Metcalf Exh. E-4 at 111:25–112:12). This fact is off-topic for purposes of the motivation element of Pete's selective-enforcement claim. *Second*, Pete cites a deposition transcript that includes testimony by Jeff Baker stating that Pete and others had expressed to him concern that they were being treated differently by the OPD on the basis of race (Metcalf Exh. E-7 at 66:22–67:18, 70:1–19). The subjective views of plaintiff Pete or other supposed victims, however, has no probative value at all regarding the intent behind defendants' actions.

Pete argues: "The truth of the matter is that OPD targeted clubs like Plaintiff's business for no reason other than to oppress African-Americans." (Opp. 22). Even drawing all reasonable inferences in Pete's favor, however, no reasonable juror could glean that conclusion from the

9

record. Pete has not produced sufficient evidence to support his speculation that defendants' actions were part of a coordinated racial-cleansing scheme. Pete's equal-protection theory does not survive defendants' summary judgment motion. This order need not reach the parties' arguments concerning the discriminatory-effect element of this theory.

### C. Due Process

Pete alleges that "defendants violated plaintiff's liberty and property interest in his business without due process" (Opp. 10). A procedural due process claim hinges on proof of two elements: (1) a protectible liberty or property interest; and (2) denial of adequate procedural protections. *Thornton*, 425 F.3d at 1164. Regarding the first element, defendants argue that Pete has not identified any protectible liberty or property interest of his that has been infringed. They are correct.

*First*, defendants argue that Pete's loss of his business relationship with the parking garage is not actionable as a due process violation, even if Sergeant Thomas's statements to Kaddoura were false. Though perhaps a sad turn in the law, this pronouncement is true: even assuming that Sergeant Thomas's statements to Kaddoura were bald-faced lies conjured for the sole and specific purpose of disrupting Pete's business relationship with the garage, the success of Thomas's scheme would not, as a matter of law, rise to the level of *constitutional* injury under procedural due process. *See Paul v. Davis*, 424 U.S. 693, 694–712 (1976); *WMX Techs., Inc. v. Miller*, 80 F.3d 1315, 1317–20 (9th Cir. 1996). In order to interfere with a constitutionally protected liberty or property interest, a state actor must do more than defame a victim — even if the alleged defamation is motivated by the evil intent to disrupt the victim's business. *WMX*, 80 F.3d 1315 at 1317–20. If the state (as opposed to some intervening third party) has not directly deprived an individual of something more than his or her reputation — for example, by revoking or suspending a permit, or at least threatening to do so — then no procedural due process violation has occurred. *Paul*, 424 U.S. at 710–13; *WMX*, 80 F.3d 1315 at 1319–20.

Here, the record shows that it was the parking garage supervisor who made the decision to terminate the business relationship between Pete and the parking garage (Vose Exh. A(8) at 34). Pete does not identify any state action besides Sergeant Thomas's alleged defamation as

10

1  disrupting his business relationship with the garage.  Sergeant Thomas's statements to Kaddoura
2  may have been unfair and defamatory, but they did not, as a matter of law, constitute an
3  unconstitutional deprivation of a protected liberty or property interest without due process.  This
4  order notes that Pete amended his complaint multiple times in this action but never pled state law
5  claims for defamation or tortious interference with his business relationship with the garage.

6  *Second*, defendants argue that OPD's alleged scheme of abusing Municipal Code
7  Chapter 9.52 cannot support a due process claim in this action, because Pete never paid for — and
8  was never even billed for — police services.  At the hearing, Pete's counsel theorized that OPD's
9  *attempts* to extract payment were cumulatively so relentless and oppressive that Pete eventually
10 closed his club for weariness of enduring them.  Counsel, however, was unable to cite any
11 evidence in the summary judgment record showing that anyone ever asked Pete to pay, much less
12 relentless dunning.  Counsel did cite internal OPD communications and communications from
13 OPD to Pete as support for her theory of a coordinated shakedown operation.  The cited
14 documents, however, do not go nearly so far.  This order draws all reasonable inferences in Pete's
15 favor, but the leap from Pete's cited evidence to the conclusion of an attempted shakedown
16 requires decidedly *un*reasonable inferences.

17 *Third*, defendants argue that the cancellation of Pete's birthday party at Sweet's Ballroom
18 is not actionable as a due process violation.  "To have a property interest in a government benefit,
19 such as the right to renew a certificate, a person clearly must have more than an abstract need or
20 desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a
21 legitimate claim of entitlement to it." *Thornton*, 425 F.3d at 1164 (internal quotations and
22 citations omitted).  Here, the applicable ordinance provided that an application for a special
23 permit must be made at least 21 days before the event.  Oakland Municipal Code § 9.52.050(A).
24 When Pete applied for a special permit only one day before his party, he certainly was not *entitled*
25 to receive one.

26 Defendants' showing on the due process issue is sufficient to shift the burden of
27 production to Pete.  Despite counsel's passionate advocacy, Pete ultimately fails to identify
28 evidence of a protected liberty or property interest that was infringed by defendants' alleged

11

1  actions. Pete's opposition briefs assert only two allegedly protected rights: (1) "his right to
2  operate his business and reap the profits therefrom"; and (2) his "interest in his celebrated good
3  name and reputation" (Opp. 12). The Ninth Circuit does recognize a "substantive due process
4  right to engage in the occupation of [one's] choice." *Wedges/Ledges of Cal., Inc. v. City of
5  Phoenix, Ariz.*, 24 F.3d 56, 65 (9th Cir. 1994). Pete concedes, however, that reputational harm
6  cannot stand alone as the basis for a due process claim (Opp. 11). For purposes of this analysis,
7  that admission leaves only Pete's asserted right to operate his business.

8  Pete's opposition briefs provide a lengthy exposé on how this right allegedly was violated
9  by defendants, but he relies mainly on non-binding authority and vague or conclusory argument.
10 For example, Pete recounts the facts of a Fifth Circuit decision in detail and then concludes:
11 "Here, as in *San Jacinto Savings and Loan*, the record evidences a genuine issue of material fact
12 concerning Defendants' deprivation of Plaintiff's liberty and property interest by repeatedly
13 restraining Plaintiff's ability to operate his business and impugning Plaintiff's reputation with
14 association to violence and murder" (Opp. 12). It is not clear what, if any, organization principle
15 governs the remainder of the due process portion of the opposition briefs, but what is clear is that
16 Pete has not identified any evidence that defendants improperly limited his right to operate GIC.
17 This right extended only so far as the boundaries of the law, and the OPD actions that Pete
18 chronicles in his papers relate only to OPD's law enforcement efforts and concerns regarding the
19 behavior of GIC's patrons — not to Pete's right to continue operating GIC. The characterization
20 of OPD's law-enforcement activities as oppression and harassment aimed at pressuring Pete into
21 closing the club amounts to no more than Pete's own subjective argument. This characterization
22 has no independent evidentiary value, and this order finds that the summary judgment record
23 would not enable a reasonable juror to agree with Pete's conclusion.

24 Having disposed of Pete's vague theory of oppression and harassment, this order finds that
25 Pete offers no other viable theory as to how defendants allegedly impacted his right to operate his
26 nightclub. Pete does not cite any evidence that he was required to pay for police services or to
27 cease hosting nightclub events. On the contrary, the record shows that Pete still owns the venue
28 and still maintains a cabaret license for it (Vose Exh. A(1) at 212–213). Pete does not cite any

12

1  evidence that the police presence at GIC events or the discontinuation of the parking garage
2  arrangement caused his nightclub to lose business.  On the contrary, the record shows that Pete
3  continued to enjoy capacity crowds at GIC events until Pete *decided* to stop operating the
4  nightclub (Thomas Exh. B(1) at 3; Thomas Exh. B(2) at 3).

5  In order for Pete's due process theory to survive summary judgment, Pete had to go
6  beyond his pleadings and conclusions — he had to carry the burden of producing *admissible*
7  *evidence* from which a reasonable trier of fact could conclude that defendants' actions infringed a
8  protected liberty or property interest.  Pete failed to do so.  This order need not reach the second,
9  procedural, element of Pete's due process claim.

### 3.  CALIFORNIA CIVIL CODE SECTION 52.1

Pete's final claim for relief alleges that the individual defendants have damaged him in violation of California Civil Code Section 52.1.  The relevant portion of this statue provides a right of action to "[a]ny individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with" by "threats, intimidation, or coercion."  CAL. CIV. CODE § 52.1(a)–(b).  The statute further provides that "[s]peech alone is not sufficient to support an action brought pursuant to subdivision (a) or (b), except upon a showing that the speech itself threatens violence against a specific person or group of persons; and the person or group of persons against whom the threat is directed reasonably fears that, because of the speech, violence will be committed against them or their property and that the person threatening violence had the apparent ability to carry out the threat."  CAL. CIV. CODE § 52.1(j).

#### A.  Defendant Kozicki

Defendant Kozicki argues there is no evidence in the record that he directed any threats, intimidation, or coercion at Pete.  In response, Pete cites to three items of evidence:  an October 2010 email from Kozicki to Pete, and deposition testimony from both Kozicki and Pete (Dkt. No. 121 at 23–24).

The email represents that it "is written to request that you strongly consider cancelling or substantially modifying the format of your 'First Saturday' events."  It explains that these events

13

1  have been associated with "criminal and unruly activity" and that in order to manage the crowds
2  at the First Saturdays events, "we have had to draw down on police resources needed in other
3  parts of the city leaving those areas with insufficient emergency responders."  The letter goes on
4  to explain that the police department has authority to determine the necessary police staffing for
5  events and that, pursuant to Municipal Code Section 9.52.120, the police department may "hold
6  promoters/establishments financially responsible for extraordinary police resources used to
7  address problems with a nexus to their event/business."  The email notes that Pete has been
8  "unwilling to contract with the City for the necessary overtime police services that the
9  Department has recommended."  It closes by stating appreciation for "your efforts at bringing
10 night life to the downtown area," noting the Oakland's "dire financial straits," and appealing to
11 "community leaders such as you to assist us through this difficult process until such time as more
12 sustainable remedies are put in place" (Metcalf Exh. A-12).  No reasonable reading of this email
13 could infer a threat of violence against Pete.  Accordingly, it provides no support for Pete's state
14 statutory claim.  CAL. CIV. CODE § 52.1(j).

15 The portion of the Kozicki deposition transcript that Pete cites establishes merely that
16 Kozicki visited GIC on about four evenings to observe the level of disruptive activity in the area
17 (Vose Exh. A(15) at 66:6–67:3).  This testimony is not evidence of threats, intimidation, or
18 coercion by Kozicki.  The cited portions of the Pete deposition transcript reference a "hostile
19 relationship with the Oakland Police Department" and "a death by a thousand cuts" (Vose
20 Exh. A(1) at 22:8–9 and 24:10–11).  These vague, conclusory characterizations by Pete himself
21 also are not evidence of threats, intimidation, or coercion by defendant Kozicki.  This order finds
22 that Pete has failed to carry his burden of producing any evidence from which a reasonable juror
23 could conclude that defendant Kozicki directed threats, intimidation, or coercion at Pete.
24 Accordingly, Pete's state statutory claim fails as to defendant Kozicki.

25 **B.  Other Remaining Defendants**

26 The other remaining defendants argue that the state statutory claim is substantively
27 defective because Pete cannot prove that they violated or attempted to violate any of his rights.
28 Pete responds with only the conclusory statement that "the record has shown repeatedly that

Defendants have violated Plaintiff's constitutional rights to due process, equal protection, and freedom of association" (Dkt. No. 120 at 24).  To the contrary, this order found that the record does *not* contain evidence sufficient to enable a reasonable juror to find any such violations. Pete's state statutory claim therefore fails as to the remaining defendants as well.

*     *     *

This order need not reach the individual defendants' argument that they are entitled to qualified immunity.

## CONCLUSION

The requests for judicial notice are **GRANTED** as to Oakland Municipal Code Section 9.52 and as to the August 1999 Eastbay Express newspaper article.  Pete's other requests for judicial notice are **DENIED**.  As to the Metcalf exhibits cited in this order and the documents filed at Dkt. Nos. 124–37 that are cited in this order, defendants' authenticity and timeliness objections are **OVERRULED**.  All of defendants' other evidentiary objections are **MOOT**.  Both defense motions for summary judgment are **GRANTED**.  Judgment will be entered accordingly.  This order disposes of the entire action.  All remaining case management dates are **VACATED**.

Finally, counsel are reminded that on appeal they should please limit their assignments of error to the summary judgment record rather than wide-ranging proffers that lack support in the actual record.

**IT IS SO ORDERED.**

Dated: March 10, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

15